IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**RAY CURTIS**                                                                            **PLAINTIFF**

v.                                             No. 4:11-cv-195 KGB

**ARKANSAS STATE PLANT BOARD**                              **DEFENDANT**

## OPINION AND ORDER

Plaintiff Ray Curtis brings this action under 42 U.S.C. § 2000e (Title VII of the Civil Rights Act of 1964, as amended), 42 U.S.C. § 1983, and the Fourteenth Amendment to the United States Constitution against his former employer, the Arkansas State Plant Board ("Plant Board"), alleging race discrimination and retaliation. Mr. Curtis also asserts a state-law breach of contract claim. The Plant Board seeks summary judgment on Mr. Curtis's claims (Dkt. No. 13). For the reasons that follow, the Plant Board's motion for summary judgment is granted. Because the Court grants the Plant Board's motion for summary judgment, the Court denies as moot the Plant Board's pending motion *in limine* (Dkt. No. 36).

    **I.**     **Factual Background[1]**

Mr. Curtis was hired by the Plant Board as a Liquid Petroleum Gas Technician in 1996. In 1999, he was promoted to the position of Metrologist and began working in the Plant Board's Bureau of Standards Laboratory ("Standards Lab"). The Director of the Plant Board is Darryl Little; he has held that position since July 2002. The Director of the Plant Board's Bureau of Standards Division is Tom Pugh; he has held that position since July 2005.

---

[1] The following facts are taken from Defendant's Statement of Undisputed Facts (Dkt. No. 15), Plaintiff's Response to Defendant's Statement of Undisputed Facts (Dkt. No. 24), and Defendant's Reply to Plaintiff's Response to Defendant's Statement of Undisputed Facts (Dkt. No. 27) unless otherwise noted by specific citation.

The Standards Lab houses the Plant Board's weights and measures program. Although the parties dispute the scope of recognition and certification required, under Arkansas law, the Plant Board is required to have a weights and measures program traceable to the National Institute of Standards and Technology ("NIST"). Without NIST recognition, the Standards Lab cannot calibrate standards for work to be done outside the State of Arkansas (Dkt. No. 27-1).

Mr. Curtis does not dispute that he received NIST training throughout his tenure with the Plant Board (Dkt. No. 24, ¶ 4). Initially, he trained with NIST in Washington, D.C. Mr. Curtis attended an NIST training program at least annually. In June 2008, Mr. Curtis attended a five-day "Laboratory Administration Workshop" sponsored by NIST and, in September 2008, attended NIST's four-day "Southwest Assurance Program." In April 2009, Mr. Curtis attended a six-day "Combined Regional Measurement Assurance Program" and, in June 2009, attended a five-day "Laboratory Administration Workshop" put on by the NIST.

The Standards Lab lost NIST certification in 2004. At the time, the Standards Lab was staffed by two metrologists: Mr. Curtis and James Chastain. In 2004, Randy Burns, a Moisture Meter Lab Technician, served as the acting supervisor of the Standards Lab, and Tim Chesser, a supervisor of Weights and Measures inspectors, was the Laboratory Supervisor. Neither Mr. Burns nor Mr. Chesser worked directly in the lab, despite holding these positions. Adrian Hawkins became the Laboratory Supervisor in November 2004. He resigned in September 2005, and, at that time, Mr. Chastain was promoted to the Laboratory Supervisor position.

In November 2005, Mr. Curtis filed a charge of discrimination against the Plant Board with the Equal Employment Opportunity Commission ("EEOC") alleging that the Plant Board's decision to promote Mr. Chastain over him was racially motivated. He also claimed that Mr.

Chastain wrongfully suspended him.  Mr. Curtis's November 2005 EEOC charge was resolved through mediation in February 2006.

On March 10, 2006, Mr. Chastain was given a performance rating of "exceeds standards."  However, in November 2006, Mr. Little demoted Mr. Chastain to a non-supervisory position in the Seed Division, at which point the Laboratory Supervisor position was open and advertised.  The job description for the Laboratory Supervisor position stated that the position was "governed by the National Institute of Standards and Technology."  Duties of the Laboratory Supervisor included "[d]irect[ing] all metrological testing and equipment calibration for industry and various governmental agencies according to National Institute of Standards and Technology procedures," and "[p]articipat[ing] in NIST laboratory testing programs to maintain laboratory certification and traceability requirements" (Dkt. No. 24, ¶ 13).

The Plant Board interviewed two people for the Laboratory Supervisor position:  Mr. Curtis and Gregory Adams, who is Caucasian.  Mr. Curtis was hired into the position effective December 2006.  Plant Board officials told Mr. Curtis that getting the Standards Lab NIST certified was very important.  Mr. Curtis told the Plant Board that the Standards Lab could attain full certification only with their support (Dkt. No. 27, ¶ 15).  He testified that he never felt that he was in over his head and never felt that he could not get the Standards Lab certified (Dkt. No. 24, ¶ 16).

In January 2007, Georgia Harris, an NIST official, wrote to Mr. Curtis providing instructions to aide in obtaining laboratory certification.  Ms. Harris included a "checklist to ensure that a complete package is submitted to NIST for review," pointed out deficiencies in the Standards Lab's previous submission, and provided contacts at NIST in the event Mr. Curtis had any questions or comments (Dkt. No. 24, ¶ 17).

Mr. Curtis filed a second charge of discrimination against the Plant Board with the EEOC in March 2008 in which he alleged he was denied use of a business credit card, that his cell phone service was cut off, and that positions in the Standards Lab had not been filled. The EEOC issued a right-to-sue letter on May 8, 2008. Mr. Curtis testified that he needed the business credit card only once—to make hotel reservations for an annual training meeting—and those arrangements were made by a Plant Board staff member. He also testified that he was promptly provided with another phone when he reported that his had stopped working. From November 2007 to July 2008, Mr. Curtis did not have any metrologists working under him.

The Standards Lab received conditional certification from NIST in 2008, conditioned upon a favorable site review by NIST staff. The NIST review was not favorable, and the Standards Lab lost its conditional certification by the end of the year.

On August 18, 2008, Mr. Curtis received a performance evaluation score of "exceeds standards." The performance evaluation was signed by Mr. Sullivant and Mr. Pugh.

In December 2008, the Plant Board hired two consultants to assist Mr. Curtis in obtaining full NIST certification: L. F. Eason, who had extensive experience managing a metrology laboratory in North Carolina, and Val Miller, a member of NIST's Weights and Measures Division Laboratory Metrology Group. Consultants Eason and Miller conducted three-day site visits to the Standards Lab in December 2008.

On January 9, 2009, Ms. Harris notified Mr. Curtis and Mr. Pugh that NIST would provide a detailed listing of prerequisites critical to NIST certification once it received the report from consultants Eason and Miller. Following their on-site visits, Eason and Miller notified the Plant Board that there were issues that must be corrected before NIST could certify the Standards Lab. Eason and Miller presented to the Plant Board a list of 23 detailed recommendations.

Consultant Miller wrote in a February 5, 2009, letter to Mr. Pugh, with a copy to Mr. Curtis, that "[Eason] and I believe that the Arkansas Bureau of Standards laboratory has the staff, standards, and equipment to reach the goal of receiving the Certification of Recognition . . . [h]ow management and staff respond to these findings will determine . . . how quickly this will happen" (Dkt. No. 24, ¶ 27).

On February 15, 2011, Ms. Harris wrote detailing several deficiencies in the Standards Lab (Dkt. No. 27, ¶ 32). She noted that the Standards Lab needed to have good software management and questioned how the lab backed up its electronic files. She further noted that "[n]o data, evidence, or explanation [had] been provided" to support the assessment that humidity controls, while sometimes outside the limits, do not affect the integrity of the tests being performed. Finally, she noted that "[b]alances, scales, and mass comparators need service and calibration on a regular interval, and proper meniscus reading tools are needed in the volume laboratory." Mr. Curtis claims that he attempted to address some of these concerns but was unable to get the support of management (Dkt. No. 27, ¶ 32).

When Mr. Pugh asked Ms. Harris in an email dated February 19, 2009, whether the Standards Lab had a conditional certification, she responded: "No. A conditional recognition is pending corrective action and successful proficiency testing" (Dkt. No. 24, ¶ 28).

In a February 18, 2009, email to consultant Miller, Mr. Curtis wrote that the consultants' visit "was very enlightening" and that all items listed in the consultants' report "will be corrected and or address[ed] in our response" (Dkt. No. 24, ¶ 29). Mr. Curtis posed a list of questions to consultant Miller. In a responsive email, Miller noted: "I'll address each item in your list by number . . . [h]owever, I must point out that answers to all of these questions have been provided

5

in some form in the Basic and Intermediate Seminars, at numerous RMAP meetings and at the Lab Admin Workshop in which you participated last June" (Dkt. No. 24, ¶ 29).

In a March 4, 2009, email to Mr. Curtis, Plant Board Deputy Director Gerald Fulbright asked whether the NIST report from consultant Miller had been answered.  Mr. Curtis responded, "[n]ot yet" (Dkt. No. 24, ¶ 31).  Mr. Fulbright emailed Mr. Curtis again on March 17, 2009.  Mr. Fulbright reminded Mr. Curtis in the email that consultants Miller and Eason "believe[d] that the Arkansas Bureau of Standards laboratory ha[d] the staff, standards and equipment to reach the goal of receiving the Certificate of Recognition" and that "[h]ow management and staff respond to these findings will determine how quickly this happens."  Mr. Fulbright also wrote that Mr. Curtis had stated in a February 18, 2009, meeting that it would be "no problem" to have the response prepared by February 23 (Dkt. No. 27, ¶ 32).

In an April 17, 2009, email to Mr. Pugh, with a copy to Mr. Curtis, Mr. Fulbright asked, "[h]ave you responded to the NIST report dated February 5, 2009?"  Mr. Pugh responded on April 20, 2009, that "this matter is in Ray [Curtis]'s hands and he is fully aware of the importance of not only responding but getting the Arkansas lab certified" (Dkt. No. 24, ¶ 33).

In an undated memo apparently drafted on April 29, 2009, Mr. Curtis wrote to Bureau of Standards Deputy Director Bill Sullivant:  "Billy, on Wednesday April 29, 2009 you called me into your office and stated that Tom called and left a message for me to respond to the letter he received on February 9, 2009 from Val Miller of NIST in reference to L. F. Eason On-Site assessment of December 17-19, 2008.  You are my supervisor and I'm doing as you request" (Dkt. No. 24, ¶ 34).  Mr. Curtis then provided a two-page response to consultant Miller's 23-point recommendation, which Mr. Pugh provided to consultant Miller on April 30, 2009 (Dkt. No. 24, ¶ 35).

On April 29, 2009, Mr. Pugh emailed Ms. Harris that he was "distressed" about the Laboratory's status, and that he was "at a loss to understand why, after 2½ years as lab supervisor and numerous assurances from [Mr. Curtis] to Bill Sullivant and me will be recognized, we are not" (Dkt. No. 24, ¶ 36). On May 5, 2009, Ms. Harris responded to Mr. Pugh that she certainly could relate to Mr. Pugh not understanding why it was taking so much time, and that "[f]rom our perspective, it should not have taken this long" (Dkt. No. 24, ¶ 37). "To date, we have not received a response indicating the planned corrective action (other than assurance that the letters would be addressed), with proposed deadlines, nor have we seen evidence of completion of corrective actions, evaluation of effectiveness, status reports, or revised submissions. We are not able to process what we don't have. We are not able to evaluate what hasn't been sent to us yet. I can assure you that once we have received materials, we will take action as quickly as possible" (Dkt. No. 24, ¶ 37). Mr. Pugh forwarded Ms. Harris's response to Mr. Curtis, instructing him to "[p]lease read, respond to Georgia's observation comments and get the requested information to me ASAP." Mr. Curtis responded, "[a]s soon as I have it I'll send it out" (Dkt. No. 24, ¶ 37).

On August 27, 2009, Mr. Curtis received an unsatisfactory performance evaluation for the period of October 1, 2008 through October 1, 2009. The performance evaluation included the following comments: "Laboratory Recognition/Certification by NIST continues to be the number one priority for this management," "Calibration/tolerance testing of Registered Agencies' artifacts continued on suspension due to lack of NIST recognition/certification," and "[p]osition is concentrating on receiving NIST recognition/certification" (Dkt. No. 24, ¶ 39). Mr. Curtis did not appeal his unsatisfactory evaluation (Dkt. No. 24, ¶ 38).

7

In an email to Mr. Curtis dated November 21, 2009, Ms. Harris noted regarding Mr. Curtis's recent submission to NIST that "[t]here are a number of items missing and incomplete that are required for your laboratory to receive Recognition. . . . I am quite disappointed in the submission. . . . Frankly, the submission was more complete last year. . . . Given the status of this submission, we will not review it further until all items are submitted. If they are submitted between now and the end of the year, we will not have time to do another review until after January 1" (Dkt. No. 24, ¶ 40). In an email to Mr. Curtis dated December 10, 2009, Ms. Harris noted that "[t]he second two CDs you've sent still haven't addressed everything we requested." Among other criticisms, Ms. Harris noted that a checklist Mr. Curtis sent in was an "old" version, that Mr. Curtis's commenting "will be completed before the next assessment" was "not an adequate response," and that Mr. Curtis had not submitted an inventory of his laboratory software (Dkt. No. 24, ¶ 41).

Mr. Curtis filed a third charge of discrimination against the Plant Board with the EEOC on March 3, 2010, challenging the unsatisfactory performance evaluation he had received on August 27, 2009. He received a right-to-sue letter on November 9, 2010.

In August 2010, Ms. Harris notified the Plant Board that the Standards Lab had once again failed to earn NIST certification. Among the various criticisms contained in an 11-page memorandum, Ms. Harris noted:

> We did not issue a 2010 Certificate of Measurement Traceability for your laboratory this year. The NIST Weights and Measures Division (WMD) did not receive your complete annual submission material prior to the November 15, 2009 deadline. NIST WMD had to perform several reviews and make subsequent requests for follow up information. In fact, five separate sets of files were received by our office over a several month period. Most of the content in each reference file was a duplication of previous materials (which was incomplete) and no additional information was submitted from the Arkansas laboratory on two separate occasions and provided email feedback to Ray Curtis on November 21 and December 10, 2009.

(Dkt. No. 27, ¶ 43).  Ms. Harris also noted that a "detailed assessment report" was provided by consultants Miller and Eason following their December 2008 site visit that listed "a number of noncompliant items [that] were required to be completed prior to issuing Recognition " (Dkt. No. 24, ¶ 44).  She wrote that "[d]uring the Laboratory Administration Workshop in June 2009, she and Ray Curtis met to review the list of noncompliant items to itemize what specific corrective action would be required to satisfy the Recognition criteria."  Still, "[e]vidence of corrective action was not received as a part of the initial submission and only portions of the evidence were received in subsequent submissions" (Dkt. No. 24, ¶ 44).

Mr. Curtis received a second unsatisfactory performance evaluation on August 25, 2010.  Comments on his evaluation included:  "[l]aboratory recognition by NIST was rejected" and "[t]he overriding directive was achieving some level of recognition from NIST.  NIST gave no recognition and was negative about the quality of submission" (Dkt. No. 24, ¶ 45).  On September 1, 2010, Mr. Curtis was placed on performance probation through December 1, 2010, with the "required result" being that his performance be satisfactory by the completion of the period (Dkt. No. 27, ¶ 46).

Mr. Curtis appealed his unsatisfactory performance evaluation on September 9, 2010, alleging that Mr. Pugh had asked Mr. Curtis one day in 2005 whether he was cooking "chitlins."  Mr. Curtis testified that Mr. Pugh occasionally called him "Bud."

On September 10, 2010, Mr. Pugh wrote to Mr. Curtis that he denied Mr. Curtis's request to change his performance evaluation but that Mr. Curtis could appeal his decision further (Dkt. No. 24, ¶ 48).  Mr. Curtis did not do so (Dkt. No. 24, ¶ 48).

On November 10, 2010, Mr. Curtis filed a fourth charge of discrimination against the Plant Board with the EEOC challenging his August 25, 2010, unsatisfactory performance evaluation and obtained a right-to-sue letter on December 7, 2010.

Mr. Pugh and Mr. Little extended Mr. Curtis's probation, which was set to expire December 1, 2010, through March 1, 2011.

On February 15, 2011, following a site visit, Ms. Harris gave the Standards Lab the following assessment:

> Overall, the laboratory document and records system is of poor quality, contains numerous errors, inconsistencies, and failures in following procedures. One of two findings of this type might be overlooked on a normal assessment visit, with every confidence that findings would be corrected. However, this appears to be an ongoing systemic issue with items identified in nearly every type of document and record in the laboratory. NIST has observed cases where a new metrologist, working alone, has been able to attend training and complete all documentary and measurement requirements within one year. The kinds of uncorrected errors that are documented in this summary have been going on for several years. Many of these problems have been identified in the past and still have not been adequately corrected.

(Dkt. No. 27, ¶ 51). Following Ms. Harris's assessment, Mr. Little directed that Mr. Curtis's employment be terminated for unsatisfactory job performance (Dkt. No. 24, ¶ 52).

On February 23, 2011, Mr. Curtis filed a fifth charge of discrimination against the Plant Board with the EEOC alleging that his probationary period was extended and that he was subsequently terminated due to his race and in retaliation for filing previous EEOC charges. Mr. Curtis received a right-to-sue letter on June 24, 2011. Mr. Curtis filed the current lawsuit against the Plant Board on February 28, 2011 (Dkt. No. 1).

### II. Summary Judgment Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-moving party to establish by "specific facts" that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An issue of fact is material only if it could affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). "Because summary judgment is not disfavored and is designed for 'every action,' panel statements to the contrary are unauthorized and should not be followed." *Id.*

### III. Analysis

#### A. Eleventh Amendment Immunity

Mr. Curtis concedes that his 42 U.S.C. § 1983 claims are barred by the Eleventh Amendment. The Eleventh Amendment bars suit against a state and its agencies, regardless of the type of relief sought. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984); *Monroe v. Arkansas State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007). The Plant Board argues, and the Court agrees, that Mr. Curtis's state-law breach of contract claim is also barred by the Eleventh Amendment. *Dover Elevator Co. v. Arkansas State Univ.*, 64 F.3d 442, 446-47 (8th Cir. 1995) (holding that state agencies are immune from breach of contract actions, whether damages or specific performance is the remedy sought). Accordingly, Mr. Curtis's 42 U.S.C. § 1983 and state-law breach of contract claims are dismissed.

### B. Timeliness

The Plant Board contends, and the Court agrees, that any claims based on the alleged acts of discrimination in Mr. Curtis's first, second, and third charges of discrimination filed against the Plant Board with the EEOC are barred. The allegations in Mr. Curtis's first charge were resolved through mediation in February 2006. Any claims based on the alleged acts of discrimination in Mr. Curtis's second and third charges of discrimination are barred either because Mr. Curtis did not file the charge within 180 days after the alleged discrimination occurred or because Mr. Curtis did not file suit within 90 days of receiving his right-to-sue letter. *See Burkhart v. American Railcar Indus., Inc.*, 603 F.3d 472, 475-76 (8th Cir. 2010); *Garrison v. International Paper Co.*, 714 F.2d 757, 759 n.2 (8th Cir. 1983). The Court will proceed to examine the Title VII claims raised based on Mr. Curtis's fourth and fifth charges of discrimination filed against the Plant Board.

### C. Title VII Claims

"'[A]n employee may survive an employer's motion for summary judgment' either by producing 'direct evidence of discrimination,' or 'by showing a genuine dispute for trial under the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-05 (1973).'" *Floyd-Gimon v. Univ. of Ark. for Med. Scis.*, __F.3d__, 2013 WL 2988704, at *6 (8th Cir. 2013) (alteration in original) (quoting *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009)).

Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Torgerson*, 643 F.3d at 1043-44. Such evidence may be circumstantial; however, it must "clearly point[] to the

presence of an illegal motive." *Floyd-Gimon*, 2013 WL 2988704, at *7 (alteration in original) (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). "Direct," therefore, refers to the causal strength of the proof. *Torgerson*, 643 F.3d at 1044.

Under the *McDonnell Douglas* framework, the plaintiff bears the burden of establishing a *prima facie* case of discrimination." *McGinnis v. Union Pac. R.R. Co.*, 496 F.3d 868, 873 (8th Cir. 2007). If a plaintiff makes out a *prima facie* case, he creates a presumption of unlawful discrimination, and the burden shifts to the defendant to come forward with evidence of a legitimate nondiscriminatory reason for its actions. *Id.* "If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual." *Id.*

Mr. Curtis does not argue that there is direct evidence of discrimination. The Court acknowledges that Mr. Curtis contends that Mr. Pugh once asked Mr. Curtis whether he was cooking "chitlins" and occasionally called him "Bud." These comments are not direct evidence of discrimination because there is no evidence that they relate to any adverse employment decision. *See Floyd-Gimon*, 2013 WL 2988704, at *8. Therefore, the Court will proceed to the *McDonnell Douglas* analysis to evaluate Mr. Curtis's Title VII claims.

**1.     Race Discrimination**

To make out a *prima facie* case of race discrimination under *McDonnell Douglas*, a plaintiff must show that: (1) he was a member of a protected class; (2) he was meeting the employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011). The Plant Board contends that Mr. Curtis cannot establish the second and fourth elements of his *prima facie* case. The Court agrees.

The job description for Laboratory Supervisor emphasized the importance of attaining full NIST certification. Plant Board officials told Mr. Curtis that getting the Standards Lab NIST certified was very important. Mr. Curtis's August 2009 performance evaluation states that attaining NIST certification "continue[s] to be the number one priority for this management."

Mr. Curtis attended various NIST training programs while employed by the Plant Board. The Plant Board hired two consultants to assist Mr. Curtis in attaining full NIST certification. Following their on-site visits, the consultants presented to the Plant Board 23 detailed recommendations for attaining certification. Georgia Harris from the NIST followed up with a detailed listing of prerequisites critical to attaining full certification and worked with Mr. Curtis to achieve full certification. Both the consultants and Ms. Harris believed the Standards Lab could achieve full certification. On May 5, 2009, Ms. Harris responded to an email from Mr. Pugh that she certainly could relate to Mr. Pugh not understanding why attaining certification was taking so much time, and that "[f]rom our perspective, it should not have taken this long." Ms. Harris was critical of Mr. Curtis's efforts to attain full certification on more than one occasion.

Although Mr. Curtis purports to put at issue Plant Board support for achieving full NIST certification, on this record, it cannot be disputed that Mr. Curtis did not attain full NIST certification during his four-year tenure as Laboratory Supervisor. Therefore, on this record, no reasonable jury could find that Mr. Curtis was meeting the Plant Board's legitimate job expectations. *See Shanklin v. Fitzgerald*, 397 F.3d 596 (8th Cir. 2005).

In addition Mr. Curtis has failed to establish an inference of discrimination. "A plaintiff can satisfy the fourth part of the *prima facie* case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased

14

comments by a decisionmaker." *Pye*, 641 F.3d at 1019 (citing *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1039-40 (8th Cir. 2010)). The Eighth Circuit "has two lines of cases on the standard to determine whether employees are 'similarly situated' at the *prima facie* stage of the *McDonnell Douglas* test." *Id.* (quoting *Wimbley v. Cashion,* 588 F.3d 959, 962 (8th Cir. 2009)). The first line of cases "sets a low threshold, requiring only that the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* (quotation omitted). The other line of cases "more rigorously requires that the employees be similarly situated in all respects." *Id.* (quotation omitted). Recently, in *Chappell v. Bilco Co.*, 675 F.3d 1110 (8th Cir. 2012), the Eighth Circuit confirmed that the appropriate inquiry is whether the employees are similarly situated in all relevant respects.

Mr. Curtis argues that Mr. Chesser, Mr. Burns, Mr. Hawkins, and Mr. Chastain were similarly situated employees. The Court disagrees. Unlike Mr. Curtis, neither Mr. Chesser nor Mr. Burns were full-time Lab Supervisors, and there is no evidence that they did not satisfactorily perform their respective job duties. Moreover, their performance evaluations were not done by Mr. Pugh, who did not become Director of the Plant Board until July 2006.

Mr. Hawkins and Mr. Chastain were full-time Lab Supervisors like Mr. Curtis; however, Mr. Hawkins held the position for only eight months, and Mr. Chastain held the position for only 14 months. Mr. Curtis was Lab Supervisor for over four years. Mr. Hawkins never received a performance evaluation as Lab Supervisor, and Mr. Chastain was evaluated as Lab Supervisor by Mr. Sullivant, not by Mr. Pugh.

Viewing these facts in the light most favorable to Mr. Curtis, these individuals are not similarly situated to Mr. Curtis, and he has not established a *prima facie* case of race discrimination.

Even if Mr. Curtis could make out a *prima facie* case of race discrimination, his failure to attain full NIST certification constitutes a legitimate, nondiscriminatory reason for his unsatisfactory performance evaluation and subsequent termination. *See Miner v. Bi-State Dev. Agency*, 943 F.2d 912 (8th Cir. 1991). The Plant Board's burden here is not onerous. *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012). Courts do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Id.* at 955 (quotation omitted). The Plant Board need only proffer a good-faith reason for its action. *Id.*

Finally, Mr. Curtis cannot establish pretext. "There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext." *Torgerson*, 643 F.3d at 1047. First, "[a] plaintiff may show that the employer's explanation is unworthy of credence because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer." *Id.* In this sense, Mr. Curtis's burden of establishing pretext "merges with the ultimate burden of persuading the court that [he was] the victim of intentional discrimination." *Id.* at 1046.

Mr. Curtis relies on the same potential comparators to establish pretext. "At the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Bone*, 686 F.3d at 956 (quotation omitted). The potential comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* "To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." *Id.* "In determining whether a plaintiff has met his burden with respect to pretext in a summary judgment motion, a district court is prohibited from making a credibility judgment

or a factual finding from conflicting evidence." *Yates v. Rexton, Inc.*, 267 F.3d 793, 800 (8th Cir. 2001).

For the reasons stated above, Mr. Chesser, Mr. Burns, Mr. Hawkins, and Mr. Chastain are not proper comparators. In addition, the adverse employment decisions about which Mr. Curtis complains were made by Mr. Little and Mr. Pugh, the same individuals who promoted Mr. Curtis to the position of Laboratory Supervisor. "The courts have held that it is unlikely that a person would hire a minority and then . . . decide to fire that same person based on [] the minority status." *Takele v. Mayo Clinic,* 576 F.3d 834, 839 (8th Cir. 2009) (alteration in original) (quoting *Calvin v. Yellow Freight Sys., Inc.*, 218 F.3d 904, 906-07 (8th Cir. 2000)).

For these reasons, the Court concludes that Mr. Curtis has failed to make out a *prima facie* case of race discrimination under Title VII. Even if he could make out a *prima facie* case, his claim would fail at the pretext stage. Accordingly, the Plant Board is entitled to summary judgment on Mr. Curtis's race discrimination claim, and his race discrimination claim is dismissed with prejudice.

## 2. Retaliation

To make out a *prima facie* case of retaliation under *McDonnell Douglas*, a plaintiff must show that: (1) he is engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and the protected activity. *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 818 (8th Cir. 1998). The Plant Board asserts that Mr. Curtis cannot prove causation.

Title VII claims of retaliation require proof that the desire to retaliate was the but-for cause of the challenged employment action, not merely a motivating factor. *University of Texas Southwestern Med. Cntr. v. Nassar*, __U.S.__, 2013 WL 3155234 (2013). Generally, more than

a temporal connection is required to establish a causal connection. *Tyler v. University of Arkansas Bd. of Trustees*, 628 F.3d 980, 985 (8th Cir. 2011). "As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation . . . ." *Id.* "The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months." *Id.*; *see, e.g.*, *Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641 (8th Cir. 2009) (holding that gap of seven months was not sufficiently contemporaneous to indicate a causal connection); *Recio v. Creighton Univ.*, 521 F.3d 934 (8th Cir. 2008) (holding that six month gap did not establish causal connection). The Eighth Circuit has determined that a gap as short as two months did not establish a causal connection. *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133 (8th Cir. 2006).

Even viewing all of the facts in the light most favorable to Mr. Curtis, he can point to nothing more than an alleged temporal connection in support of his retaliation claim, and when that alleged temporal connection is examined, it is measured in mere months. That timeline is insufficient to establish a submissible question of fact regarding alleged retaliation. Mr. Curtis was awarded the position he claims he was denied because of his race just ten months after filing his first charge of discrimination. With respect to his second charge, Mr. Curtis received an excellent performance evaluation on September 18, 2008; more than a year passed before Mr. Curtis received the unsatisfactory performance evaluation. It was not until August 25, 2010, nearly six months after Mr. Curtis filed his third charge of discrimination, that Mr. Curtis received a second unsatisfactory performance evaluation and was placed on probation. Finally, there is a three-month gap between Mr. Curtis's fourth charge and his termination, and as the

Plant Board points out, Mr. Curtis was terminated only after the Plant Board extended his probation to provide him another opportunity to attain NIST certification.

Mr. Curtis has not presented evidence sufficient to create a genuine dispute as to whether the facts alleged give rise to retaliatory discharge. Accordingly, the Plant Board is entitled to summary judgment on Mr. Curtis's Title VII retaliation claim, and his Title VII retaliation claim is dismissed with prejudice.

* * *

For the foregoing reasons, the Plant Board's motion for summary judgment is granted (Dkt. No. 13), and Mr. Curtis's claims are dismissed with prejudice. Because the Court grants the Plant Board's motion for summary judgment, the Court denies as moot the Plant Board's pending motion *in limine* (Dkt. No. 36).

SO ORDERED this 15th day of July, 2013.

_____
Kristine G. Baker
United Sates District Judge